Before studying the history of the power of the Governor to partially veto an appropriations bill, especially after the final adjournment of the legislature, I thought that the Governor had no such power; however, after studying the history and purpose of the "line item" veto provisions, as are contained in § 126 of the 1901 Alabama Constitution, I concluded that the question was more debatable than I first had thought.
Under the 1901 Alabama Constitution, the Governor, when considering for approval or disapproval bills passed by the legislature, is exercising a lawmaking function, and the power of executive veto has been given to the Governor in every Constitution ratified by the people of this State, starting in 1819. In 1875, the people provided for the Governor to have an additional specific power to "disapprove of any item of any bill making appropriations of money."[5] That special power to exercise an item veto of an appropriations bill is contained in § 126 of the 1901 Constitution.[6]
The general purpose of giving the Governor "line item" veto power over appropriations bills, at least in part, was to prevent "logrolling," a practice the framers of the 1901 Constitution attempted to preclude by other provisions of the 1901 Constitution, one being § 45.[7] *Page 861 
It is clear to me that the people, in § 126 and its predecessor, intended to grant to the Governor a special power
to check legislative power, especially legislative power to pass appropriations bills.
The specific question presented here, of course, is not whether the Governor can partially veto an appropriations bill presented within time for the Governor to return it to the legislature while it is still in session, but whether the Constitution provides that the Governor can exercise his partial veto of an appropriations bill, even after the legislature has adjourned sine die. The question is made more difficult because of the history of budget-making in this State, and the action taken by the people in response to what has occurred in the budget-making process in the past. For many years, the legislature did not pass the appropriations bills until the final days of the session, and on at least one occasion the legislature adjourned a regular session sine die
without passing an appropriations bill at all.[8]
Because the general fund and educational appropriations bills are usually some of the last items of business considered by the legislature, as was the case during the recently concluded regular session,[9] the power of the Governor to exercise a line-item veto is never quickened because the bill is not presented to him while the legislature is still in session.
The people, of course, are aware of what has transpired in the past regarding bills making basic appropriations, and the people have directly addressed the responsibilities of not only the Governor, but also of the legislature, in the budget-making process, and have provided in Amendment No. 448 to the 1901 Constitution that the Governor "[o]n or before the second legislative day of each regular session of the legislature, . . . transmit to the legislature for its consideration a proposed budget for the then next ensuing budget period," and in Section (C) of that amendment have provided that "[t]he duty of the legislature at any regular session to make the basic appropriations for any budget period that will commence before the first day of any succeeding regular session shall beparamount." (Emphasis added.) Amendment No. 448, proclaimed ratified December 10, 1984 (the "Budget Isolation Amendment"). There is only one exception to the requirement of the Budget Isolation Amendment that appropriations bills must be "paramount": the house in which a bill is pending can, by adoption of a resolution concurred in by three-fifths of the quorum present, consider other legislation. The legislature, in its wisdom, has adopted many of these so-called "budget isolation resolutions" in the past, and obviously adopted many of them during the regular session just concluded, because the act under consideration is Act No. 91-732.
I recognize, of course, that the legislature, by routinely adopting these budget isolation resolutions, could violate the spirit and intent of the Budget Isolation Amendment, but judicial restraint compels me to respect the decisions of a coordinate branch *Page 862 
of government so long as it is acting within the power granted to it by the people, and it is not "clear beyond a reasonable doubt" that it is unconstitutional. Ala. State Fed. of Labor v.McAdory, 246 Ala. 1, 18 So.2d 810 (1944). The legislature has the power to decide if there are items of legislation that are more paramount than the appropriations bills.[10] I further recognize that the legislature, by not presenting the appropriations bills to the Governor in sufficient time before final adjournment for him to exercise his power of partial veto, could effectively write out of the Constitution the provisions of § 126 that give the Governor that power. Nevertheless, I have read the debates of the Constitutional Convention on what are now §§ 125 and 126,[11] have studied the briefs submitted by the parties in this action, and have listened to the oral arguments, and because I have great respect for the doctrine of separation of powers, and not being convinced that the people have granted to the Governor the power he sought to exercise, I am compelled to conclude that the 1901 Alabama Constitution does not give the Governor the power to partially veto an appropriations bill after the legislature has adjourned sine die.
To sustain the Governor's partial veto in this case would require a liberal reading of the 1901 Constitution, and, in effect, would require that much of the partial veto language in § 126 be included into the language of § 125. I cannot go that far. In that regard, I agree with that portion of Justice Houston's special concurrence regarding the rule of construction that must be applied. I concur in the majority's opinion that holds that the Governor could not partially veto House Bill 203.
[5] Art. V. § 14, Constitution of 1875.
[6] During the 1901 Constitutional Convention debates, Mr. Jones of Montgomery, who was chairman, described the purpose of what is now § 126, as follows:
 "I desire to state in behalf of the Committee that the only change in that relates to a question of practice. The present Constitution says the Governor can veto a specific item of an appropriation bill and the question then arose as to whether it was his duty to send the bill back with his message and as he has already approved the bill, the opinion seems to be that it had no business back in the House and this provides that in his message he shall set out specifically the item to which he objects and file the bill with the Secretary of State instead of returning it to the House."
Official Proceedings, Constitutional Convention 1901, Vol. 1, p. 682.
[7] Section 45, which states, in part, that all laws shall contain but one subject, exempts general appropriations bills, of course, but a strong argument could be made that the people, in 1875, gave to the Governor line item veto power to allow the Governor to strike from those bills appropriations that might have been the result of logrolling. Unquestionably, after 1875, if the Governor disapproved of an item or items in an appropriations bill, he could strike those out, and approve the remaining parts of the bill, file it with the secretary of state, and it then became the law. Mr. Jones, during the debates in the 1901 Constitutional Convention, said regarding what is now § 126:
 "MR. JONES (Montgomery) — I would state on behalf of the committee that the draft of this section was taken from the old Constitution, with a few words describing the practice. . . .
". . . .
 "MR. ROBINSON — You would have the enrolled bill with that item disapproved of by the Governor in the Secretary of State's office and you have the action on the veto in the journal?
 "MR. JONES — There is some slight incongruity either way, but it seemed highly improper to the committee to have a bill before the House that was already a law and with which the House had nothing to do. It should be regulated one way or the other, but the committee has no set desire about that matter."
Official Proceedings, Constitutional Convention, 1901, Vol. 1, p. 683. Insofar as I can tell, the practice followed between 1875 and 1901 was not changed. I was unable, because of the lack of time, to look in all the original records in the Department of Archives to determine exactly how line-item vetoes were treated procedurally, but there is little question that in the case of an appropriations bill, when the Governor approved an item of appropriation, it was the law. Executive amendments made under the provisions of § 125, of course, required that the enrolled bill be returned to the legislature with a message from the Governor stating his objections. The enrolled appropriations bill, in cases of a line-item veto, definitely was not returned to the legislature. That is clear from the debates.
[8] In Wallace v. Baker, 336 So.2d 156 (Ala. 1976), the Governor, by executive order, attempted to appropriate public funds for education when the legislature had adjourned without having passed an appropriations bill. This Court held that the Governor was without authority to make appropriations and that he would have to call a special session of the legislature.
[9] The legislature, during the recently concluded regular session passed a general appropriations bill, but the Governor pocket-vetoed it. The Governor called a special session to pass an appropriations bill and that special session has just concluded.
[10] A legislative practice, of course, even though of long duration, can violate fundamental law. For years, the legislature passed general bills of local application (so-called GBLA's), and this Court, many years later, inPeddycoart v. City of Birmingham, 354 So.2d 808 (Ala. 1978), held the practice to be unconstitutional.
It would seem to me that the purpose of budget isolation resolutions would be to adopt legislation that would directly or indirectly affect the budget process, such as revenue-producing measures, etc.
[11] Mr. Oates made a comparison between the present Constitution and the provisions of the 1875 Constitution, and regarding §§ 125 and 126, he set out the following:
 "[The Governor's] veto of bills and other powers are somewhat extended, but better defined than in the present Constitution."
(Emphasis added.) Official Proceedings, Vol. IV, p. 4930. Note: The printer of the official proceedings at p. 49-50 omitted a line from this quote, but I obtained the original copy of the proceedings from the Department of Archives, and it correctly shows this quote.
Even though the power of the Governor to exercise his veto power "[was] somewhat extended," I do not believe that the framers intended to extend it to permit an executive veto of items or items of an appropriations bill.